# EXHIBIT G

1  days, was it a couple of weeks, was it several months?
2      A.   I believe it was over a few months.
3      Q.   Okay.  When did they start?
4      A.   I believe it would have started in early
5  March.
6      Q.   And did they end in April?
7      A.   My recollection was the end of April.
8      Q.   So about two months?
9      A.   Right around there.
10     Q.   Did you independently research the FCRA at all
11 when you were having these discussions?
12     A.   I did not.
13     Q.   Whose ultimate decision was it to change the
14 form in 2016?
15     A.   That would be our legal, our outside counsel
16 and inside counsel.
17     Q.   So the lawyers were empowered with making the
18 ultimate decision?
19     A.   Yes.  I did not make any changes to the form.
20     Q.   Just the lawyers?
21     A.   Correct.
22     Q.   Did that decision from the lawyers need to be
23 approved by anyone on the business side?
24     A.   Not that I recall.
25     Q.   Have you ever received any training yourself

1  center team as well.
2      Q.   And is she still with the company?
3      A.   She is.
4      Q.   In that same capacity?
5      A.   Correct.
6      Q.   With respect to background checks, what does
7  the training cover?
8           MS. TROTTER:  I'm going to object.  I
9  think you're now getting into attorney-client privileged
10 communication.  This is counsel directed and it was
11 information specific to 7-Eleven, so I'm going to object
12 and instruct her not to answer.
13          MR. WOODROW:  Okay.
14          MS. TROTTER:  The line we had tried to
15 draw here in communications with you and I think what
16 our agreed-upon understanding was, that we'd let her
17 testify broadly without getting into the specifics of
18 any communication because it's always been our position,
19 as communicated to you, that we're maintaining the
20 privilege and that was the compromise that we reached
21 ahead of time.
22          MR. WOODROW:  Yeah.  I'm trying to figure
23 out if the privilege actually applies.  It seems like
24 the legal was tasked with making a business decision
25 here and that opens things up.  So what I think we

```
 1   should do is table those questions, take them to the
 2   court, have them decide any issues on privilege, and
 3   then if we need to come back, we can.
 4              MS. TROTTER:  I don't think this witness
 5   has testified as to who made the business decision or
 6   would she be qualified to do so.
 7              MR. WOODROW:  She testified literally two
 8   minutes ago that the lawyers made the decision.
 9              MS. TROTTER:  No, she didn't.
10              MR. WOODROW:  Yes, she did.
11              MS. TROTTER:  She said -- she testified
12   that she did not make the decision, that she did not
13   change the form and that the lawyers had the ultimate
14   say.  That -- that means nothing more than it was the
15   lawyers' version that was implemented.
16              MR. WOODROW:  Now you're testifying,
17   Counsel, and that's inappropriate.  It's not what she
18   said.  It mischaracterizes her testimony.
19              MS. TROTTER:  I disagree.
20              MR. WOODROW:  Counsel, she said that the
21   lawyers have the final decision.  I asked if anyone
22   needed -- if the business side needed to sign off on it
23   and she said no.  Counsel --
24              MS. TROTTER:  Do you know if anyone on
25   the business side needed to sign off on it?
```

```
 1   said earlier on the record she did not change the form.
 2   Okay.  You're trying to say that she testified
 3   exclusively that it was a business decision of the
 4   lawyers, and that is a misstatement of her testimony.
 5        Q.   (BY MR. WOODROW) Did the lawyers make the
 6   decision with respect to the final form?
 7             MS. TROTTER:  If you know.
 8        A.   The lawyers drafted the final version, yes.
 9        Q.   Did those lawyers need to seek sign-off from
10   anyone on the business side?
11             MS. TROTTER:  Calls for speculation, lack
12   of foundation.
13             Only if you know.
14        A.   Not that I'm aware of.
15             MR. WOODROW:  Okay.  It does open it up,
16   Counsel.
17             MS. TROTTER:  It doesn't.  We can meet --
18             MR. WOODROW:  We can --
19             MS. TROTTER:  -- and confer about that
20   later.
21             MR. WOODROW:  And that's what I'm saying
22   is that we're disagreeing.  So why don't we agree to
23   table it, we'll meet and confer.  If we can't agree,
24   we'll take it to the judge.
25             MS. TROTTER:  That's fine.  Yeah, you can
```

1  table all those questions, but I think that you had
2  misstated her testimony on the record earlier, and
3  that's what I wanted to make sure it's clear.
4          MR. WOODROW:  Well, the good news is that
5  we have a court reporter here so everything's been
6  written down.
7          MS. TROTTER:  Okay.
8      Q.   (BY MR. WOODROW) So I'd like to show you
9  what's going to be marked as Exhibit --
10         COURT REPORTER:  4.
11     Q.   -- 4.
12         (Exhibit No. 4 marked.)
13     Q.   Real quick, before we go back, did Chrissy
14 Smith have any -- do any independent research regarding
15 the FCRA back in April 2016?
16         MS. TROTTER:  Calls for speculation,
17 lacks foundation.
18     A.   I don't know.
19     Q.   Take a look at what's been presented to you as
20 Exhibit 4.
21     A.   Okay.
22     Q.   Do you recognize this document?
23     A.   Yes.
24     Q.   What is it?
25     A.   This is the original contract with TalentWise.