# EXHIBIT B

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| EDWARDO MUNOZ, Individually and on behalf of all others similarly situated, | ) ) ) ) |
| | ) CIVIL ACTION |
| Plaintiff, | ) NO.: |
| | ) 2:18-CV-03893-RGK-AGR |
| VS. | ) ) |
| 7-ELEVEN, INC., a Texas corporation, | ) ) ) |
| Defendant. | ) |

_____

ORAL DEPOSITION OF
KRISTIN COPE
JANUARY 30, 2019

_____

ORAL DEPOSITION OF KRISTIN COPE, produced as a
30(b)(6) witness at the instance of the PLAINTIFF, and
duly sworn, was taken in the above-styled and numbered
cause on the 30th of January, 2019, from 9:34 a.m. to
3:01 p.m., before STEFANIE COX, CSR in and for the State
of Texas, reported by machine shorthand, at the offices
of Collins Realtime Reporting, 325 N. Saint Paul Street,
Suite 2575, Dallas, Texas 75201.

1    7-Eleven's Disclosure Form during the Relevant Period of

2    Time.

3                    Did you do anything to prepare yourself to

4    testify on Topic 11?

5         A.    Yes, reviewed e-mails with internal and

6    external counsel yesterday.

7                    MS. TROTTER:  And I just had an objection

8    here that pursuant to our meet-and-confer efforts, I

9    think the topic was slightly revised because we'd agreed

10   that the form that the witness will testify about is

11   only the form that's at issue in the case, but we

12   agreed, and I think this is at your request, that she

13   would be able to discuss, you know, what is presented at

14   the same time that that form is presented to the

15   applicant as noted in our objection and in our

16   confirmation of our meet-and-confer conference call.

17        Q.    Since -- the thicker disclosure form at issue

18   in this case is the one that was provided to Mr. Munoz;

19   we agree on that, right?

20        A.    Correct.

21        Q.    Okay.  That same FCRA form was used for

22   corporate employees, above-store employees, meaning

23   managers or executives, people who don't actually work

24   in the stores, correct?

25        A.    Correct.

Kristin Cope - 1/30/2019

53

1      Q.    And those above-store employees used that same

2  FCRA form starting sometime in 2016, correct?

3      A.    Correct.

4      Q.    All right.  And then in June of 2017, that

5  same FCRA form was then applied to the corporate store

6  employees, like Munoz, correct?

7      A.    That is correct.

8      Q.    Okay.  From the time that that FCRA form was

9  used in 2016 with the above-store folks, through the

10  time of Mr. Munoz's hiring and subsequent termination,

11  were there any changes made to the FCRA form?

12      A.    There was a change to the name of the company.

13      Q.    Aside from TalentWise becoming Sterling, were

14  there any other changes?

15      A.    No.

16      Q.    So do we agree that the disclosure form

17  provided to Munoz is, in substance, the same disclosure

18  form that was in use for the above-store employees,

19  starting sometime in 2016, and then all the corporate

20  store employees starting June 2017?

21      A.    That's correct.

22            MS. TROTTER:  And that's -- with that

23  understanding is where we based our numbers that we

24  provided in discovery.  So I think we are all on the

25  same page.

1       Q.      Okay.  You testified earlier that Munoz

2   applied to work on January 28th, 2018.  Does this

3   information make you want to change your answer?

4       A.      Yes.  I misspoke.  The background check was

5   submitted for processing on 1/28.

6       Q.      Okay.  But when did Munoz actually apply to

7   work?

8       A.      I don't know that.

9       Q.      Okay.  Ostensibly, it was sometime before

10  January 28th?

11      A.      It would have been January 26th or before.

12      Q.      Okay.  I notice that this document on the

13  first page, which is marked -- is that SEV by the way?

14      A.      Yes.

15      Q.      What does SEV stand for, do you know?

16              MS. TROTTER:  That's our internal Bates

17  number.

18              MR. WOODROW:  Okay.

19              MS. TROTTER:  So it's a law firm, how we

20  track the Bates number and what our paralegal uses to

21  identify.

22              MR. WOODROW:  Okay.  That was --

23              MS. TROTTER:  I believe it's probably 7.

24              MR. WOODROW:  That was the big question.

25  Okay.

Kristin Cope - 1/30/2019

82

1       Q.    Do you know which states those are?

2       A.    I do not.

3       Q.    Some of the forms in Munoz's new hire

4    paperwork are specific to California, correct?

5       A.    Correct.

6       Q.    Okay.  Does the system do that automatically

7    based on store location?

8       A.    Yes.

9       Q.    So turning to page 3, at the top it says,

10   Disclosure Regarding Background Investigations.

11              Is that correct?

12      A.    That is correct.

13      Q.    And it says, The purpose of maintaining the

14   safety and security of our stores, customers, employees,

15   and property, 7-Eleven, Inc., may order a "consumer

16   report," "background report," or "investigative consumer

17   report" on you in connection with your application for

18   employment or your ongoing employment with 7-Eleven,

19   Inc.

20              Do you see that?

21      A.    I do.

22      Q.    Okay.  And is that a correct statement?

23      A.    That is correct.

24      Q.    Okay.  Do you know the difference between a

25   consumer report and an investigative consumer report?

Kristin Cope - 1/30/2019

83

```
 1        A.    I personally do, yes.

 2        Q.    Are you -- I want to be clear, are you

 3   testifying on behalf of yourself personally or on behalf

 4   of 7-Eleven?

 5              MS. TROTTER:   You asked her do you know.

 6   I think she's just trying to --

 7        Q.    You are 7-Eleven for the purposes of today,

 8   correct?

 9        A.    Correct.

10              MS. TROTTER:   The question as phrased was

11   a little ambiguous, which is what she was trying to --

12   it's an awkward question --

13              MR. WOODROW:   Sure.

14              MS. TROTTER:   -- to ask --

15              MR. WOODROW:   Sure.

16              MS. TROTTER:   -- a person -- a

17   knowledgeable witness, that phrase, so it probably makes

18   sense the way she clarified it.

19        Q.    (BY MR. WOODROW)  Fair enough.  What's the

20   difference?

21        A.    So a consumer report, an example would be a

22   credit check, a background is a criminal and criminal

23   history, and investigative is a personal reference.

24        Q.    So for investigative consumer reports, is that

25   more where you're going back and calling references?
```

```
 1                    If you don't understand the question, you

 2      can advise counsel.

 3           A.    I agree the words on the page are the words on

 4      the page.

 5           Q.    Okay.  Then the next paragraph, the report may

 6      contain information from federal, state, and other

 7      agencies, learning institutions, information service

 8      bureaus, past/present employers and other individuals or

 9      sources concerning your character, general reputation,

10      personal characteristics, mode of living, work habits,

11      and/or credit standing.  Such information may include

12      your driving history, your credit history, your

13      education history, records of military service,

14      insurance claims involving you, your criminal history,

15      and your employment history, including the reasons for

16      termination.

17                    You had mentioned before that a background

18      report was for criminal history.  Does a background

19      report cover more than criminal history?

20                    MS. TROTTER:  Vague and ambiguous also.

21      I think as phrased it calls for a legal conclusion.

22           Q.    You can answer the question if you know.

23           A.    I'm not aware.

24           Q.    But before you did say that when you see

25      background report as compared to consumer report, you
```

 1    said that a consumer report is a credit check whereas

 2    the background report is for criminal history.  Do you

 3    remember testifying that way?

 4         A.    Yes.

 5         Q.    And is that still accurate?

 6         A.    Yes.

 7         Q.    The in -- the paragraph continues, the

 8    information contained in the report may be obtained from

 9    private and/or public record sources and the

10    investigation can also involve personal interviews with

11    sources, such as your current and past employers,

12    private -- strike that -- sources such as your current

13    and past employers, friends, family members, or

14    associates.

15                   You see that sentence?

16         A.    I do.

17         Q.    And does that tie in to the investigative

18    consumer report that you described earlier?

19         A.    It does.

20         Q.    And that language is in there, just in case

21    you guys need to do that, correct, you don't actually do

22    it?

23         A.    We do not do that today.

24         Q.    Did you do that at any point from 2016 on to

25    today?

1      A.    We have not.

2      Q.    Information included in the report will only

3  be requested when permitted by law, and where such

4  information is substantially related to the duties and

5  responsibilities of the position for which you are

6  applying.  7-Eleven, Inc., will not obtain information

7  about your credit history, creditworthiness, credit

8  standing, or credit capacity unless permitted by

9  applicable state and local law.  You have the right,

10  upon written request made within a reasonable time after

11  receipt of the notice, to request disclosure of the

12  nature and scope of any investigative consumer report

13  from 7-Eleven, Inc.

14             Do you see that language?

15      A.    I do.

16      Q.    The reports being described in that paragraph,

17  are they consumer reports, background reports, and

18  investigative consumer reports?

19      A.    Yes.

20      Q.    So all three are being described in one

21  paragraph, correct?

22      A.    That is correct.

23      Q.    The next sentence, the Fair Credit Reporting

24  Act provides you with specific rights in dealing with

25  consumer reporting agencies.  You will find these rights

Kristin Cope - 1/30/2019

1    a background check on them.

2         Q.   So do you --

3         A.   But a simple checkmark of this electronic

4    signature here just allows for them to essentially move

5    on and complete the entirety so that the packet will go

6    into our next system.

7         Q.   So it's your testimony that if a person never

8    electronically signs on page 6, that 7-Eleven is still

9    able to obtain a consumer report or a background check

10   on a consumer?

11              MS. TROTTER:  I'm going to object as

12   phrased because as phrased it calls for a legal

13   conclusion.  I think you can ask her whether 7-Eleven

14   does without the signature, but I think as phrased

15   you're asking can 7-Eleven, which calls for a legal

16   conclusion.

17        Q.   Well, does 7-Eleven consider itself able to

18   obtain a background check or a consumer report on

19   someone if they haven't signed on 000006?

20              MS. TROTTER:  Also, it's overbroad as

21   phrased.  As to -- depending on, I guess, who and the

22   jurisdiction, so as phrased it includes, I guess, you're

23   asking nationwide.

24              MR. WOODROW:  Yeah.

25        A.   So this information is not submitted until

Kristin Cope - 1/30/2019

105

1    that checkmark on the last page is signed because it is

2    all through integrations.

3          Q.    Right.

4          A.    So the system considers this form is allowed

5    to be submitted when the checkmark on page 6 is complete

6    and then it is electronically submitted to Sterling.

7          Q.    Has 7-Eleven ever obtained a background check

8    regarding an applicant who didn't sign the document

9    reflected at page 6?

10         A.    I do not know.

11         Q.    Has 7-Eleven ever only relied on the supposed

12   signature present on page 3 to obtain a background

13   check?

14         A.    I do not know.

15         Q.    When you say the system's integrated, you mean

16   that it's automated, correct?

17         A.    Correct.

18         Q.    Okay.  So if the person doesn't sign on page

19   6, the check box doesn't appear and the information is

20   never sent to Sterling, correct?

21         A.    That is correct.

22         Q.    So in order for the information to be sent to

23   Sterling, they must sign on page 6, correct?

24         A.    That is correct.

25         Q.    Going to page 11, do you see the employee

1    see in relation to this certain process.

2        Q.    Can you turn to page 86 for me.  And you see

3    where it says background checks?

4        A.    I do.

5        Q.    Can you read the first paragraph?

6        A.    For U.S. locations, background checks are

7    initiated in Hire Right when you change the status of

8    your candidate to Hired.  Background checks must be

9    complete before the candidate can start working.

10       Q.    Is that still true, that background checks

11   must be complete before the candidate can start working?

12       A.    No.

13       Q.    Okay.  Do you know when that changed?

14       A.    From my knowledge, that has never been the

15   case.

16       Q.    So from your knowledge, this sentence,

17   background checks must be complete before the candidate

18   can start working, is not correct?

19       A.    In reference to store-level applicants,

20   correct.

21       Q.    Is there a difference for the nonstore-level

22   applicants?

23       A.    Yes.  Our nonstore-level applicants complete

24   their background checks prior to begin working.

25       Q.    So the store-level folks like Munoz, they're

1    allowed to start working before the background check is

2    clear, correct?

3        A.    That is correct.

4        Q.    But the nonstore-level folks, their background

5    checks have to be complete before they can start

6    working?

7        A.    That is correct.

8        Q.    All right.  So before when I was asking you

9    questions about it this morning, we didn't draw a

10   distinction, but now there is a distinction between the

11   store-level and the nonstore-level employees?

12       A.    Yes.

13       Q.    Okay.  And has that always been the case while

14   you were -- while you've been working at 7-Eleven?

15       A.    Correct.

16       Q.    Okay.  So when it says, Background checks must

17   be complete before the candidate can start working, your

18   testimony is that that sentence only applies to the

19   nonstore-level employees?

20       A.    That is correct.

21       Q.    And what do you call the nonstore-level

22   employees?

23       A.    Nonstore.

24       Q.    Okay.  So in terms of the background check

25   disclosure and authorization form that we went through

Kristin Cope - 1/30/2019

152

1      Q.    What kind of lead time do you need in order to

2   make the change?

3                MS. TROTTER:  Calls for speculation.

4      Q.    In your experience?

5      A.    It varies on the extent of the changes.  If

6   it's building a new form, it could take a lot longer

7   than simply just updating a document.

8      Q.    Do you recall what that process was like in

9   April 2016?

10     A.    I don't.

11     Q.    Do you recall what it was like in June

12  of 2017?

13     A.    Well, the form had already been provided to

14  Equifax, it was just not being utilized by our stores

15  until June of 2017.

16     Q.    So the heavy lifting was back in April

17  of 2016?

18     A.    Correct.

19     Q.    7-Eleven has provided in discovery responses

20  that approximately 57,000 employees and applicants got

21  the same FCRA disclosure as Munoz and had a background

22  check performed on them by Sterling; is that correct?

23     A.    That is correct.

24     Q.    How did you arrive at that number?

25     A.    So based on what we discussed earlier with the

1    filters that you can utilize to pull information out of

2    the applicant tracking system, so it's based on if

3    they're a corporate store from June of 2017 through the

4    date that the report was produced in October.  And then

5    it's also based on if it was a nonstore and somebody

6    that was sent the form in 2016.

7            Q.    You said nonstore?

8            A.    Yes, the above store.

9            Q.    When you say the nonstores, we're talking

10   about those employees who don't work at the stores?

11           A.    Correct.

12           Q.    Like you?

13           A.    Correct.

14           Q.    Okay.  Do you have 75 -- strike that.  57,000

15   was an estimate, correct, it wasn't exactly 57,000

16   people, was it?

17           A.    Correct.  It was pretty close.

18           Q.    Do you know the exact number?

19           A.    Not off the top of my head.

20           Q.    Okay.  Do you know if it's slightly above

21   57,000 or slightly below?

22           A.    I wouldn't know.

23           Q.    Turning the page to request to produce No. 5,

24   can you read that and the objection?

25           A.    All Documents sufficient to identify all